CLOSED

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————

|  |  |  |
|---|---|---|
| HECTOR RODRIGUEZ, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 07-1090 (SRC) |
| v. | : | |
| | : | **OPINION** |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

———————————————————:

**CHESLER, U.S.D.J.**

### INTRODUCTION

Plaintiff Hector Rodriguez ("Plaintiff"), pursuant to 42 U.S.C. §§ 1383(c)(3), 405(g),[1]

seeks review of the Commissioner of Social Security Administration's ("Commissioner")

decision denying his application for Disability Income Benefits ("DIB") and Supplemental

Security Income ("SSI") benefits. Plaintiff argues that the decision is not supported by

substantial evidence and should be reversed. For the reasons set forth in this Opinion, this Court

finds that the Commissioner's decision is supported by substantial evidence and should be

affirmed.

---

[1] These sections of the Social Security Act (hereinafter "Act") provides that any
individual may obtain a review of any final decision of the Secretary of Health and Human
Services ("Secretary") made subsequent to a hearing to which he or she was a party. The federal
district court for the district in which the plaintiff resides is the appropriate place to bring such
action. 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Plaintiff filed an application for DIB on June 27, 2001 and SSI benefits on December 2, 2002 pursuant to Sections 216(i), 223, and 1614(a)(3)(A) of the Social Security Act, codified as 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A), respectively.  (Tr. 65; 68-72.)[2]  Plaintiff alleged disability since August 30, 1997 due to hernia, asthma, poor vision and high blood pressure, as independent impairments or, in the alternative, in the aggregate.  (Pl.'s Mem. L. at 2.)  Following the Social Security Administration's denial of Plaintiff's DIB and SSI benefits applications on January 28, 2002 (Tr. 30), Plaintiff filed a request for reconsideration on March 11, 2002 (Tr. 36).  The denial was affirmed on September 17, 2002.  (Tr. 37.)

After filing a November 4, 2002 request for a hearing (Tr. 40), Plaintiff appeared for a hearing before Administrative Law Judge Richard L. DeSteno ("ALJ DeSteno") on October 30, 2003 (Tr. 48), during which he was provided with an interpreter (Tr. 52).   ALJ DeSteno then held a supplemental hearing with a vocational expert on February 24, 2004 to determine the type of work, if any, Plaintiff could do in light of prior work activity and residual functional capacity considering age, education, training and work experience and if such work existed in the national economy.  (Tr. 58-59.)  ALJ DeSteno issued a decision on April 9, 2004, finding that Plaintiff was not eligible for DIB or SSI benefits based upon his disabilities.  (Tr. 27.)  The ALJ's findings were as follows:

> 1.      The claimant meets the nondisability requirements for a period of
>         disability and Disability Insurance Benefits set forth in Section 216 (I) of

---

[2] The Act instructs the Secretary to file, as part of his answer, a certified copy of the transcript of the record, including any evidence used to formulate his conclusion or decision. 42 U.S.C. § 405(g). "Tr." refers to said transcript.

the Social Security Act and is insured for benefits through December 31, 1997.

2.     The claimant has not engaged in substantial gainful activity since the alleged onset of disability

3.     The claimant did not have a medically determinable "severe" impairment on or before December 31, 1997, his date last insured for disability insurance benefits.  In regard to his supplemental security income application, the claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4.     These medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

5.     The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.     I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.     The claimant has had, at all material times, the residual functional capacity for light work not involving exposure to heights or dangerous machinery, not involving detailed visual work, and not otherwise requiring binocular vision; in an environment free of excessive pulmonary irritants.

8.     The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416. 965).

9.     The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416. 963).

10.    The claimant has "a limited education" and is literate in English (20 CFR §§ 404.1564 and 416. 964).

11.    The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416. 968).

12.    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

3

13.   Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform, in view of vocational expert testimony.  Examples of such jobs include work as a labeler, garment turner, packer scale operator and office cleaner.  There are about 1,200 such jobs in the Northern New Jersey area and 25,000 such jobs in the State of New Jersey and metro New York area combined.

14.   The claimant was not under a "disability," as defined in the Social Security Act, through December 31, 1997 (his date last insured for disability insurance benefits) or at any time through the date of this decision (for supplemental security income payments) (20 CFR §§ 404.1520(f) and 416. 920(f)).

(Tr. 26-27.)  Based on these findings, ALJ DeSteno concluded that Plaintiff was "not eligible for

DIB or SSI benefits under sections 216(i), 223, 1602 and 1614(a)(3)(A) respectively, of the

Social Security Act."  (Tr. 27.)   On April 21, 2004, Plaintiff filed a Request for Review of ALJ

DeSteno's hearing decision, which was denied by the Acting Administrative Appeals Judge,

David E. Clark, on February 2, 2007.  (Tr. 5-8.)  Pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g),

Plaintiff filed the instant action, seeking reversal of the Commissioner's decision.


## STATEMENT OF THE FACTS

**A.      Background**

Plaintiff was born on September 30, 1954 in Puerto Rico, came to the United States in

1975 and ceased working in May 1992.  (Tr. 65, 66, 200, 214.)  He testified that he was willing

and able to work prior to the onset of his disability on August 30, 1997 but was unable to find a

job.  (Tr. 66-67.)  He also testified that he completed school up to the ninth grade in Puerto Rico

and is able to read and write in Spanish but can only read in English.  (Tr. 200.)  Plaintiff worked

for William Bal Corporation for fifteen years as a tacking machine operator making trunks for

airline parts until the factory moved in May 1992.  (Tr. 69, 200-201.)  Plaintiff testified that the

position required him to stand and lift cases weighing approximately twenty pounds.  (Tr. 202-

203.)  Additionally, five or six times a year for two to three days at a time, Plaintiff worked in the

shipping department which was more labor intensive and required him to lift items weighing as

much as eighty pounds.  (Tr. 203-204.)   Plaintiff also noted in his testimony that the air quality

in the factory was very poor due to dust and chemicals resulting from the plastic production

process.  (Tr. 204.)

**B.     Claimed Disabilities**

Plaintiff alleges onset of his disability in 1995, which is three years after he ceased

working.  (Tr. 205.)  Plaintiff testified that he suffers from a hernia, asthma, poor vision and high

blood pressure.   (Tr. 206-213.)

Plaintiff claims that his asthma began in 1995 .  (Tr. 206.)  He testified that due to his

asthma, he loses his breath and therefore is unable to walk more than one block and has a limited

ability to climb stairs and stand.  (Tr. 211.)  He claims that these physical limitations are

exacerbated by his hernia which makes it difficult for him to stand, go up and down stairs or sit

and bend.  (Tr. 212.)  He also claimed that his high blood pressure prevents him from having

surgery and causes dizziness and headaches.  (Tr. 213.)   However, Plaintiff testified that he is

able to cook and clean the house, activities that include sweeping and mopping the floor and

washing dishes.  (Tr. 216-217.)

Plaintiff complains that his eye problems began in 1998, but he did not seek treatment for

5

this aliment until 2000, because he did not realize what was happening.  (Tr. 206-207.)  The 2000

eye appointment resulted in a diagnosis of cataracts that led to surgery on his right eye.  (Tr.

207.)  Plaintiff now claims that he is unable to read, has no vision in the left eye and has limited

vision in the right eye.  (Tr. 208-209.)  He also testified that cataract surgery in his left eye is

impossible until his high blood pressure is controlled.  (Tr. 207-209.)  The ALJ noted that the

Plaintiff "almost missed the chair" at the October 30, 2003 hearing when he sat down to give his

testimony.  (Tr. 210.)

### C.    Medical Evidence Considered by the ALJ

The record indicates that Plaintiff has been evaluated by physicians on several occasions.

The following is a summary of the medical evidence presented to the ALJ.

1.    October 7, 1999 and June 22, 2000 Medical Records from Columbus Hospital

Plaintiff went to Columbus Hospital for the first time on October 7, 1999 after being

diagnosed with a right groin bulge hernia on September 12, 1999.  (Tr. 119.)  During this visit,

his blood pressure was 200/110, and he noted that he had been talking medication to control his

hypertension but could not recall the name of the prescription.  (Tr. 119.)  Plaintiff went for a

follow up examination on June 22, 2000 which was conducted by Dr. P. Reyes through the

charity care clinic.  (Tr. 115.)  At the time of the examination, Plaintiff's blood pressure was

156/80.  (Tr. 116.)  As a result of this examination, Dr. Reyes scheduled surgery for Plaintiff's

right inguinal groin hernia on June 29, 2000.  (Tr. 116.)  This surgery was never performed, but

no reason for this is apparent in Plaintiff's medical records.  (Tr. 120.)

2.    September 4, 20001 Internal Medicine Consultative Examination

On September 4, 2001, Dr. R. C. Patel examined Plaintiff at the request of the Social

Security Administration.  (Tr. 121.)  Plaintiff identified a history of asthma for the prior five years, hypertension since 1994 and a right inguinal hernia for the prior two years.  (Tr. 120.)  Dr. Patel noted that surgery for the hernia had not taken place, and the impairment caused Plaintiff occasional pain.  (Tr. 120.)  Plaintiff complained of shortness of breath resulting from walking for three to four blocks or climbing one flight of stairs and tiredness, headaches, redness of the face and shortness of breath that occurs approximately once or twice a week when his blood pressure is elevated, but he denied having any chest pain or renal complaints from hypertension.  (Tr. 120.)  At this visit, Dr. Patel also noted that Plaintiff did not wear glasses although he had a vision problem, particularly in the right eye, and was not currently taking medication for asthma.  (Tr. 120, 121.)

Upon examination, Dr. Patel recorded the following facts: Plaintiff was 62 inches tall, weighed 176 pounds, had blood pressure in both upper extremities of 200/120, was able to see light, and had vision of 20/70 on the left side and 20/00 on the right.  (Tr. 121.)  Dr. Patel indicated that Plaintiff was not in acute distress and walked with a normal gait.  (Tr. 121.)  After conducting Plaintiff's eye examination, the doctor noted the sclerae and conjunctivae were normal and the pupils were equal but constricted.  (Tr. 121.)  The doctor examined auscultation of the lungs, which revealed diminished breath sounds but no wheezing or rales.  (Tr. 121.)  Gross neurological defects were also noted.  (Tr. 121.)  Dr. Patel diagnosed Plaintiff with uncontrolled hypertension, chronic asthma and refraction error and blindness in the right eye.  (Tr. 122.)

3.      January 25, 2002 Physical Residual Functional Capacity Assessment

On January 25, 2002, Plaintiff underwent a residual functional capacity assessment that resulted in a primary diagnosis of uncontrolled hypertension and a secondary diagnosis of asthma

7

and alleged impairments of glaucoma in both eyes and blindness in the right eye.  (Tr. 127, 134.)
The doctor determined that Plaintiff's exertional limitations were occasional lifting up to 20
pounds, frequent lifting of less than 10 pounds, standing or walking for a total of approximately 6
hours in an 8-hour workday, sitting for about 6 hours in an 8-hour workday, and unlimited
pushing or pulling, other than the limitations indicated for lifting and carrying.  (Tr. 128.)  These
findings were based on Plaintiff's uncontrolled hypertension, which was not under regular
treatment; asthma, which caused shortness of breath approximately once or twice a week upon
exertion but not attacks; inguinal hernia, which caused pain; complaints of headaches without
syncope; blood pressure of 200/120; diminished breath sounds without wheezing or rale; regular
sinus rhythm without murmur or gallop; and normal EKG with flat T waves.  (Tr. 128.)

        The doctor also noted the following postural limitations: Plaintiff could frequently
balance, stoop, kneel, crouch, and climb a ramp or stairs but could never climb a ladder, rope or
scaffold.  (Tr. 129.)  No manipulative or communicative limitations were established.  (Tr. 131,
130.)  Visual limitations found included unlimited near and far acuity in both eyes and unlimited
depth perception, accommodation, color vision and field of vision in the left eye but limited in the
right eye.  (Tr. 130.)  These findings were based on Plaintiff's uncorrected visual acuity in the
right eye of 20/400 that did not improve with refraction; corrected visual acuity in the left eye of
20/40+; a mature cataract in the right eye; mild cataract changes in the left eye; left eye extensive
increased cupping; severely constricted field of vision in the right eye; large saotoma in left eye
that was suggestive of glaucoma; and a slight decrease in visual acuity in the left eye and
decreased visual fields in the left eye.  (Tr. 130.)

        The doctor further detailed Plaintiff's environmental limitations.  He found that Plaintiff

8

had an unlimited ability to work in or around extreme cold, extreme heat, wetness, humidity,

noise, vibrations, fumes, odors, dusts, gases, poor ventilation, or other similar environmental

factors, but determined that Plaintiff must "avoid all exposure to hazards such as dangerous

machinery and heights." (Tr. 131.)  The doctor also added that Plaintiff should not perform jobs

with extended near point demands, driving or assembly line work.  (Tr. 131.)

       4.       October 16, 2001 Ophthalmology Consultative Examination

Plaintiff was examined by Dr. Thomas Materna on October 16, 2001 for a disability

determination.  (Tr. 135.)  At this appointment, Plaintiff complained of a history of hypertension,

asthma and "that he cannot see anything from his right eye for at least the past couple of years."

(Tr. 135.)  Plaintiff reported that he was on medication for hypertension but was unable to identify

his medications.  (Tr. 135.)  Upon examination, the doctor found that Plaintiff's right eye had an

uncorrected visual acuity of 20/400, and there was no improvement with refraction.  (Tr. 135.)

Plaintiff's "uncorrected visual acuity [in the left eye] was 20/50 - OS, [and] with a -1.00, the

patient was seeing 20/40+[,]" and, with an addition of +1.75, the patient was able to see clearly at

near distances.  (Tr. 135.)  Conjunctiva and sclera were clear in both eyes and extraocular motility

appeared full.  (Tr. 135.)  Plaintiff's pupils were responsive to light; a slit lamp examination

revealed normal lids, lashes, and lacrimal system; and both corneas appeared clear and anterior

chambers deep.  (Tr. 135.)  Plaintiff's irises were normal, but his lenses "appeared to reveal a

mature cataract [in the right eye] with some mild cataract changes [in the left eye]."  (Tr. 135.)

Tension applanation was 32mmHg in the both eyes.  (Tr. 135.)  A mature cataract prevented

fundus from being viewed through the pupil of the right eye , and extensive increased cupping

appeared to be in the left eye.  (Tr. 135, 136.)  Dr. Materna also found that "[t]he vessels and

macula appeared grossly normal" and an examination of the visual fields "revealed [a] severely constricted visual field in the right eye and a large scotoma in the left eye, suggestive of glaucoma." (Tr. 136.) The visual field examination prompted Dr. Materna to recommend that Plaintiff "urgently" seek "treatment of possible glaucoma" along "with his mature cataract in the right eye." (Tr. 136.) The doctor further expressed that, in his professional opinion, Plaintiff "would be temporarily totally disabled until further investigative studies were done and possibly [until after] cataract surgery or glaucoma evaluations[.]" (Tr. 136.)

     5.     October 31, 2001 and January 29, 2002 Department of Ophthalmology/UMDNJ Medical Records

Plaintiff went to the Department of Ophthalmology on October 31, 2001 for a full evaluation and returned on January 29, 2002 for a cataract evaluation. (Tr. 140, 141.) At the October 31, 2001 appointment, a biometry and intraocular lens calculation was performed on both eyes. (Tr. 146.) The lens status in both eyes was phakic, with keratometry in the right eye 43.37 x 175/44.25 x 85 and 44.00 x 175/44.25 x 85 in the left eye. (Tr. 146.) The average axial length in the right eye was 22.88 mm and 22.68 in the left eye. (Tr. 146.) Based on these ocular imaging procedures, it was determined that Plaintiff had cataracts in both eyes, but the cataract in the right eye was of greater severity. (Tr. 140, 141, 146.)

     6.     August 15, 2002 Internal Medicine Consultative Examination

Plaintiff was seen on August 15, 2002 by Dr. Lucille Buglisi of Evaluative Medical Services. (Tr. 147.) Plaintiff complained of hypertension, which he claimed to have had for three years and stated that he takes Coreg, 6.25 mg twice a day and Uniretic 15/25 once a day. (Tr. 147.) He had no complaints of chest pain or shortness of breath and said that "he feels okay and

he can do what he needs to around his house and his activities of daily living just fine." (Tr. 147.) Plaintiff also complained of decreased vision in both eyes stemming from cataracts that he developed approximately five years prior. (Tr. 147.) He stated that his right eye was operated on in June 2002 and he expected to have another operation on the same eye in September 2002. (Tr. 147.) He also alleged that "he ha[d] absolutely no vision in the left eye," a condition that was presently under treatment. (Tr. 147.) He claimed that his eye aliments do not hinder his ability to move around his apartment or go about his daily life. (Tr. 147.) Plaintiff also complained of a right sided hernia, which he said he suffered from for two years and was unable to obtain a needed surgery due to his financial situation. (Tr. 147.) No complaints about asthma were made; when the doctor asked him about that condition he stated, "oh that's fine; I have no problem with that." (Tr. 147, 148.)

Physical examination of Plaintiff revealed a height of 62 inches; weight of 177 pounds; blood pressure of 160/110; 20/40 vision in his right eye and 20/00 in his left eye. (Tr. 149.) The doctor noted that he cannot see anything through the left eye but does not wear glasses. (Tr. 149.) Doctor Buglisi concluded that

> a. Plaintiff had a large, approximately 4 x 5 inch hernia on the right side of the right testicle that required immediate attention and Plaintiff's avoidance of heavy lifting. (Tr. 149, 150.)

> b. Plaintiff's uncontrolled high blood pressure needed to be addressed. The Doctor indicated that he should have a cardiac evaluation and echocardiogram to check for left ventricular hypertrophy. (Tr. 149, 150.)

> c. Plaintiff suffers from visual loss in the left eye and has cataract problems which are under treatment, but the outcome after all medical options are exhausted is uncertain. (Tr. 150.)

> d. Plaintiff did not complain of asthma, and his examination was within normal limits.

(Tr. 150.)

7.        August 28, 2002 Ophthalmology Consultative Examination

Plaintiff met with Doctor Wertheimer of the Eye Clinic on August 27, 2002 for a disability determination.  (Tr. 153.)  Plaintiff stated that he had a history of hypertension, had surgery on his right eye to remove a cataract in June 2002, is scheduled for an additional surgery at UMDNJ on September 27, 2002, and cannot see out of the left eye.  (Tr. 153.)  Upon examination, Dr. Wertheimer noted "visual acuity was 20/25 in the right eye and hand motion vision in the left eye.  Intraocular pressure was normal.  Examination of the anterior segment of the eye revealed a post-surgical intraocular lens in the right eye, which was in good position." (Tr. 153.)  Dr. Wertheimer observed a white mature cataract in the left eye that obstructed the view of the retina.  (Tr. 153.)  However, Plaintiff's right eye had "a normal appearing optic nerve . . . with a normal appearing retina."  (Tr. 153.)  The doctor concluded the Plaintiff "is presently somewhat disabled due to his cataract" he had surgery scheduled for September 27, 2002, so the disability was likely to be temporary.  (Tr. 153, 154.)

8.        September 12, 2002 Physical Residual Functional Capacity Assessment

Doctor R. Briski determined that Plaintiff's exertional limitations were occasional lifting up to 20 pounds, frequent lifting of less than 10 pounds, standing or walking for a total of approximately 6 hours in an 8-hour workday, sitting for about 6 hours in an 8-hour workday, and unlimited pushing or pulling, other than the limitations indicated for lifting and carrying.  (Tr. 156.)  The above exertional limitations are consistent with the January 25, 2002 Functional Capacity Assessment.  (Tr. 128, 156.)  The doctor also noted the following postural limitations: Plaintiff could frequently balance and occasionally stoop, kneel, crouch, and climb ramps, stairs,

12

ladders, ropes, and scaffolds.  (Tr. 157.)  No manipulative or communicative limitations were

established.  (Tr. 158, 159.)  The doctor also found visual limitations of unlimited near acuity, far

acuity and color vision and limited depth perception, accommodation, and field of vision.  (Tr.

158.)

The doctor then detailed Plaintiff's environmental limitations, which were again

identical to the January 25, 2002 conclusions, finding that Plaintiff had an unlimited ability to

work in extreme cold, extreme heat, wetness, humidity, noise, vibrations, fumes, odors, dusts,

gases, poor ventilation, and other environmental conditions but all concentrated exposure to

hazards including machinery and heights should be avoided.  (Tr. 159.)  Additionally, it was noted

that Plaintiff had an increased risk to hazards due to his left eye vision loss.  (Tr. 159.)

The above findings were based on Plaintiff's diagnosis of asthma, although Plaintiff

denied symptoms; hypertension with a blood pressure of 160/110 from which there was no

documented end organ damage; poor vision caused by cataracts, right eye acuity of 20/40, left eye

acuity of 20/00, right eye vision of 20/25 and left eye vision of hand motion only; and a right

visible inguinal hernia that caused pain.  (Tr. 156-159.)  Dr. Briski determined Plaintiff's primary

diagnosis was asthma and the secondary diagnosis was blindness and low vision.  (Tr. 29, 163.)

10.     UMDNJ Treatment Notes - February 18, 2002 to June 27, 2002

Plaintiff was evaluated at University of Medicine and Dentistry of New Jersey in

connection with his eye surgery and hypertension.  (Tr. 167, 170, 178.)  On February 25, 2002

Plaintiff underwent a Dobutamine Stress Echocardiogram for his hypertension.  (Tr. 170.)  The

EKG was termed abnormal and the indication was hypertension with a blood pressure of 180/119

and a heart rate of 70.  (Tr. 170.)  The conclusion of the test was "negative for dobutamine-

induced ischemia at above stress level" (Tr. 170) and the test was interpreted to conclude that Plaintiff had: "[n]ormal [left ventricular] chamber size and function; . . . [m]ild to moderate concentric [left ventricular] hypertrophy; [n]o resting wall motion abnormality; [m]ild mitral regurgitation; [m]ild tricuspid regurgitation; [m]ild pulmonary hypertension . . . ; and [n]o pericardial effusion" (Tr. 171). On February 18, 2002, Chest PA & Lateral imaging was taken. (Tr. 178.) The imaging report stated "[l]inear opacities at the lung bases are consistent with scarring orfocal atelectasis. Otherwise, the lungs are clear. The cardiac silhouette is top normal size. The aorta is mildly tortuous." (Tr. 178.) On June 10, 2002, Plaintiff met with an ophthalmologist for an evaluation prior to his June 27, 2002 surgery, and the doctor evaluated Plaintiff's eyes and conducted labs in preparation for surgery. (Tr. 167.)

      11.     October 31, 2001 - January 7, 2003 UMDNJ Ophthalmology Clinic Treatment Notes

Plaintiff went to the University of Medicine and Dentistry of New Jersey Ophthalmology Clinic four times between January 2003 and June 2002 for cataract evaluations. (Tr. 180, 182, 184, 186.) At the January 7, 2003 cataract evaluation, vision in the right eye was 20/25+1 and he only had hand motion vision in the left eye. (Tr. 180.) At another cataract evaluation on August 13, 2002, Plaintiff showed right eye vision of 20/25 and unchanged left eye vision limited to hand motion. Intraocular Pressure in both eyes was 15. (Tr. 182.) At the July 23, 2002 evaluation, vision in the right eye was 20/25 -1 and vision in the left eye was again only hand motion. Intraocular Pressure in both eyes was 12. (Tr. 184.) The June 28, 2002 cataract evaluation indicated vision in the right eye was 20/200 and vision in the left eye remained  hand motion. (Tr. 186.)_

14

**D.**      **Testimony of Vocational Expert Considered by the ALJ**

On February 24, 2004, Judge DeSteno held a supplemental hearing with vocational

expert Rocco Meola, Ph. D. ("Meola") a vocational rehabilitation counselor.  (Tr. 220, 222-23.)

Meola gave his opinion based on the following factual scenario:

> Consider an individual [born] September of 1954 with a
> limited education.  Literate in English under the standards of the
> regulations but not as fluent as perhaps a natively born American
> who was brought up in English, with the work experience of a
> machine operator.
>
> With the residual functional capacity initially for lifting
> and carrying objects weighing up to 20 pounds, and frequently
> lifting and carrying objects weighing up to 10 pounds.   Sitting,
> standing and walking up to six hours in an eight hour day.  Pushing
> and pulling on the leg controls, and work not involving exposure to
> height or dangerous machinery.  Not requiring binocular vision or
> detailed visual work in an environment free of excessive pulmonary
> irritants.
>
> . . .
>
> The region . . . would be Northern New Jersey, Essex,
> Morris, Union, [Bergen], [Passaic], and Hudson Counties.
> (Tr. 224, 225.)

Meola determined that Plaintiff could perform light and unskilled jobs such as working

as a labeler, garment turner, packer, scale operator or office cleaner.  (Tr. 225.)  Meola also

testified that approximately 1,200 of this type of jobs exist in the above mentioned region,

approximately 15,000 exist in the New York Metro area, and 25,000 in the State of New Jersey.

(Tr. 225-26.)  Meola also stated that if all of the ailments Plaintiff complained of were actual,

Plaintiff would be unable to perform any of the above mentioned jobs or any other jobs in the

economy.  (Tr. 226.)  Meola testified that the jobs he mentioned could be performed by a person

having vision only in one eye, because they do not involve small objects, require depth perception, peripheral vision or detail work.  (Tr. 227-232.)  Detailed work was defined as when: "the person has to do varied work that is very fine and very small.  They might have to read a label, or print a label that is very small, or smaller than, let's say the normal pinpoint type that you might see on a printer or typewriter."  (Tr. 232.)  Meola also noted that the position of label maker could be performed regardless of whether Plaintiff had the visual capacity to read the label.  (Tr. 232.)


## DISCUSSION

### A.   Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)) and "is more than a mere scintilla, it need not rise to the level of a preponderance" McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).  The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).

The reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir.

1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).  If the ALJ's findings of fact are supported by substantial evidence, this Court is bound by those findings, "even if [it] would have decided the factual inquiry differently."  Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001); see also Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the Plaintiff and corroborated by family and neighbors; (4) the Plaintiff's educational background, work history and present age."  Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973).  "The presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision."  Sassone v. Comm'r of Soc. Sec., 165 F. App'x. 954, 955 (3d Cir. 2006) (citing Blalock, 483 F.2d at 775).

**B.        Standard for Awarding Benefits Under the Act**

The Plaintiff bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).  To qualify for DIB or SSI benefits, a Plaintiff must first establish that he is needy and aged, blind, or "disabled."  42 U.S.C. § 1381.  A Plaintiff is deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether

a Plaintiff's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  To demonstrate that a disability exists, a Plaintiff must present evidence that his or her affliction "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

## C.    The Five-Step Evaluation Process

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  The Plaintiff bears the burden of proof at steps one through four.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

At the first step of the evaluation process, the Commissioner must determine whether the Plaintiff is currently engaged in substantial gainful activity.[3]  20 C.F.R. § 404.1520(a)(4)(i), (b).  If a Plaintiff is found to be engaged in such activity, the Plaintiff is not "disabled" and the disability claim will be denied.  Id.; Yuckert, 482 U.S. at 141.

At step two, the Commissioner must determine whether the Plaintiff is suffering from a severe impairment.  20 C.F.R. §§ 404.1520(a)(4)(ii), (c).  An impairment is severe if it "significantly limits [a Plaintiff's] physical or mental ability to do basic work activities."  Id.  In determining whether the Plaintiff has a severe impairment, the age, education, and work experience of the Plaintiff will not be considered.  Id.  If the Plaintiff is found to have a severe

---

[3] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

18

impairment, the Commissioner addresses step three of the process.  20 C.F.R. §§ 404.1520(a).

At step three, the Commissioner compares the medical evidence of the Plaintiff's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1520(a)(4)(iii).  If a Plaintiff's impairment meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the Plaintiff does not suffer from a listed impairment or its equivalent, the analysis proceeds to step four.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[4] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  Id.  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x. 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the Plaintiff retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the Plaintiff is able to perform his past relevant work, he will not be found disabled under the Act.  In Burnett, the Third Circuit set forth the analysis at step four:

---

[4] Hereinafter, "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

> In step four, the ALJ must determine whether a Plaintiff's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the Plaintiff's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the Plaintiff's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether Plaintiff has the level of capability needed to perform the past relevant work.

Burnett, 220 F.3d at 120.  If the Plaintiff is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which the Plaintiff can perform, consistent with his or her medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. §§ 404.1512(g), 404.1560(c)(1).  If the ALJ finds a significant number of jobs that Plaintiff can perform, the Plaintiff will not be found disabled.  Id.

When the Plaintiff has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the burden of establishing the existence of jobs in the national economy.  These guidelines dictate a result of "disabled" or "not disabled" according to combinations of factors (age, education level, work history, and residual functional capacity).  These guidelines reflect the administrative notice taken of the numbers of jobs in the national economy that exist for different combinations of these factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When a Plaintiff's vocational factors, as determined in the preceding steps of the evaluation, coincide with a combination listed in Appendix 2, the guideline directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458 (1983).  The Plaintiff may

rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step process, "must analyze the cumulative effect of all the Plaintiff's impairments in determining whether [he] is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  Moreover, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B).  However, the burden still remains on Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 F. App'x. 240, 243 (3d Cir. 2004) (placing responsibility on the Plaintiff to show how a combination-effects analysis would have resulted in a qualifying disability).

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as their interpretation in Jones, to every step of the decision.  See, e.g., Rivera v. Commissioner, 164 F. App'x. 260, 262 (3d Cir. 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review" but need not "adhere to a particular format."  Id.

**D.    ALJ DeSteno's Findings**

ALJ DeSteno applied the five-step sequential evaluation and determined that Plaintiff was not disabled within the meaning of the Act.  (Tr. 21.)  The ALJ found that Plaintiff satisfied the first step of the evaluation process, given that he has not engaged in substantial gainful activity since the onset of his alleged disability in August 1997.  (Tr. 21.)   As Plaintiff's date last insured was December 31, 1997, a medically determinable severe impairment must have existed on or

before this date for Plaintiff to satisfy step two of the evaluation.  (Tr. 21.)  Judge DeSteno noted

that "the medical record is devoid of any medical evidence documenting [Plaintiff's] allegations

prior to October 1999 [,so] . . . the record does not establish a medically determinable severe

impairment on or before December 31, 1997[.]"  (Tr. 21, 117-119.)  Based on this conclusion,

Judge DeSteno found and held that Plaintiff's Title II disability insurance benefits were properly

denied.  (Tr. 21.)

        Judge DeSteno next evaluated Plaintiff's eligibility for Title XVI supplemental income

disability benefits.  (Tr. 21.)  He found "the medical evidence establish[ed] that Plaintiff has

inguinal hernial, left-eye blindness, some diminished vision in the right eye, hypertension, and

asthma, impairments that are severe within the meaning of the Regulations but not severe enough

to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations

No. 4."  (Tr. 21.)  The ALJ determined Plaintiff's impairments did not meet or equal any of the

listed impairments, because medical evidence in the record does not indicate that Plaintiff's hernia

"resulted in damage to any organ system in the body outlined in the listing of impairments[,]"

"documentary evidence is devoid of any treatment for asthma[,]" Plaintiff's vision impairment

could be corrected or minimized if cataract surgery is performed in the left eye, and Plaintiff's

hypertension did not result in "hypertensive cardiovascular disease[.]"  (Tr. 22.)  ALJ DeSteno

concluded that, "[a]lthough [Plaintiff] does have medically determinable severe impairments, the

evidence establishes that [Plaintiff] has the capacity to function adequately by performing many

basic activities associated with work."  (Tr. 24.)

        In addressing the fourth prong of the evaluation the ALJ determined Plaintiff "retained the

residual functional capacity to perform work involving lifting and carrying objects weighing up to

20 pounds; frequently lifting and carrying objects weighing up to 10 pounds; standing, walking,

and sitting up to six hours in an eight-hour day; pushing and pulling arm and leg controls; and light work not involving exposure to heights or dangerous machinery, not involving detailed visual work, and not otherwise requiring binocular vision; in an environment free of excessive pulmonary irritants." (Tr. 24.) Based on Plaintiff's limitations and the demands of his past relevant work, the ALJ "conclud[ed] that Plaintiff is not able to return to past relevant work due to the occasional heavy lifting required, his need to operate dangerous machinery, and the excessive air pollutants in the work environment." (Tr. 24.)

   After it is determined that Plaintiff is not capable of performing past relevant work, the Social Security Administration has the burden of demonstrating that Plaintiff is able to adapt to perform other jobs in the national economy taking into account Plaintiff's prior work experience, residual functional capacity, education and age. 20 C.F.R. § 404.1520(a)(4)(v); (Tr. 24.). After the fourth prong is satisfied, "the burden shifts to the Social Security Administration to satisfy the fifth prong and show there are other jobs existing in significant numbers in the national economy that Plaintiff can perform that are consistent with his medical impairments, age, education, past work experience and residual functional capacity. (Tr. 24.) In his fifth prong evaluation, the ALJ first determined that "[b]ased upon [Plaintiff's] residual functional capacity, he is capable of performing a significant range of light work as defined by 20 C.F.R. §§ 404.1567 and 416.967." (Tr. 25.) The ALJ then noted that "[i]f the claimant were capable of performing the full range of light work, the Medical-Vocational Guidelines would direct a finding of 'not disabled[,]'" but when a plaintiff is not able to "perform all or substantially all of the requirements of light work" based on Plaintiff's exertional and/or non-exertional limitations, "[a]n impartial vocational expert may be used to help determine whether or not there are a significant number of jobs in the national economy that [Plaintiff] can perform given his residual functional capacity

23

and other vocational factors." (Tr. 25.) "Based on the testimony of the vocational expert . . . [the ALJ found] that considering [Plaintiff's] age, educational background, work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exits in the national economy." (Tr. 26.) Consequently, the ALJ found that Plaintiff was "not disabled" under the framework set forth by Medical-Vocational Rule 202.17. (Tr. 26.)

In summary, ALJ DeSteno "conclude[d] that [Plaintiff] retains the capacity for work that exists in significant numbers in the national economy and is not under a 'disability' as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f))." (Tr. 26.)

## E.     Analysis

Plaintiff contends that the ALJ's decision should be reversed because the ALJ made a factual error in determining Plaintiff failed to establish that his impairments were of such severity to preclude him from engaging in substantial gainful activity. (Pl.'s Mem. L. at 8.) Plaintiff grounds this argument in three assertions: 1) the Commissioner improperly evaluated the medical evidence, 2) the Commissioner failed to consider Plaintiff's impairments in combination, and 3) the Commissioner erred as a matter of law in finding that Plaintiff can perform light work. (Pl.'s Mem. L. at 8-16.)

### 1.     Did ALJ DeSteno properly evaluate the medical evidence?

Plaintiff first argues that the ALJ "improperly evaluated the medical evidence." (Pl.'s Mem. L. at 9.) Plaintiff argues that the ALJ relied on "isolated statements from a doctor's report while ignoring" evidence supporting Plaintiff's disability, concluding that the ALJ committed reversible error by "ignor[ing] uncontradicted medical evidence that [Plaintiff] was totally and permanently disabled[.]" (Pl.'s Mem. L. at 13-14.) Plaintiff further asserts the ALJ did not give

proper credence to Plaintiff's subjective complaints concerning his inability to work and pain which are "supported and consistent with the medical evidence." (Pl.'s Mem. L. At 9-10.)

In assessing whether Plaintiff is disabled, the ALJ must give consideration to Plaintiff's subjective complaints of pain. 10 C.F.R. §§ 404.1529, 416.929; Dorf v. Bowen, 794 F.2d 896, 901 (3d Cir. 1986). However, subjective complaints alone will not establish that a Plaintiff is disabled. Dorf, 794 F.2d at 901. Although "assertions of pain must be given serious consideration," Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), Plaintiff still "bears the burden of demonstrating that [his] subjective complaints were substantiated by medical evidence." Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995), aff'd, 85 F.3d 611 (3d Cir. 1996). Accordingly, subjective claims of pain and impairment "will not alone establish . . . [disability]; there must be medical signs and laboratory findings . . . [demonstrating] medical impairments, which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a). The Alexander court further noted "even situations where a subjective complaint of pain coincides with a known impairment, it is within the discretion of an ALJ to discount that claim if there is a rational basis to do so." Alexander, 927 F. Supp. at 795.

The medical record indicates Plaintiff was treated and evaluated by several physicians for hypertension, asthma, a hernia, and vision impairments. The medical record does not contain evidence of disability prior to Plaintiff's date last insured, December 31, 1997. In fact, the earliest instance of medical evidence contained in the record is October 7, 1999 almost two years after the Plaintiff's insurance expired. (Tr. 21, 117-119.) The evidence from October 7, 1999 consisted of outpatient medical reports and progress notes indicating that Plaintiff suffered from high blood pressure and a right inguinal hernia. (Tr. 21, 117-119.) Based on the absence of objective medical evidence or evidence that Plaintiff underwent any treatment prior to the expiration of his

insured status, the ALJ's finding that Plaintiff was not suffering from a severe impairment[5] prior to December 31, 1997 was supported by substantial evidence as was the Commissioner's denial of Disability Insurance benefits.  See Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001); see also Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).

Since there is no requirement of insured status for eligibility for Supplemental Security Income benefits, the sequential analysis regarding SSI benefits must proceed to step two to determine whether the impairment or the combined severity of impairments is severe within the meaning of the Social Security Act.  In making the determination of disability, all symptoms should be considered, including pain, as should the extent to which such symptoms are consistent with objective medical evidence and other evidence.  20 C.F.R. § 416.929(a).  If a Plaintiff's allegations of symptoms suggest a greater severity of impairment than is supported by objective medical evidence additional factors should be considered: (1) the clamant's daily activities; (2) "[t]he location, duration, frequency, and intensity of . . . pain or other symptoms;" (3) "[p]recipitating and aggravating factors;" (4) "[t]he type, dosage, effectiveness, and side effects of any medication [used to] alleviate . . . pain or other symptoms;" (5) any treatment or other measures used to alleviate pain or other symptoms; and (6) "[o]ther factors concerning . . . functional limitations and restrictions due to pain or other symptoms."  20 C.F.R. § 416.929(c)(3). The ALJ found Plaintiff's assertions of pain "are reasonable to a degree, the overall record does not support them to the debilitating extent asserted."  (Tr. 24.)  The medical record indicates Plaintiff was treated and evaluated by several physicians for hypertension, blindness, asthma, and

---

[5]A severe impairment is one which significantly limits an individual's physical or mental ability to perform basic work activities.  20 C.F.R. §§ 404.1520 (c) and 416.920 (c).

poor vision.  However, this Court agrees with ALJ DeSteno that examinations by both

independent and state agency doctors failed to substantiate Plaintiff's claims regarding his

limitations as entirely credible.  (Tr. 26.)

An evaluation of the record indicates Plaintiff's visual limitations are not sufficiently

severe as to constitute disability with the in meaning of the listings.  In October 2001, Plaintiff

underwent an eye exam conducted by Dr. Materna, and the doctor concluded, based on a mature

cataract in the right eye and possible glaucoma, Plaintiff was "temporarily totally disabled until

further investigative studies were done and possibl[e] cataract surgery."  (Tr. 135, 136.)

Accordingly, Plaintiff underwent a full evaluation on October 31, 2001 and January 29, 2002 at

the University of Medicine and Dentistry of New Jersey.  (Tr. 140, 141.)  Based on ocular imaging

procedures, the doctor diagnosed Plaintiff with cataracts in both eyes.  (Tr. 146.)   In June of 2002,

Plaintiff underwent cataract surgery in the right eye.  (Tr. 153.)  Plaintiff's vision in the right eye

improved to 20/40 as of August 15, 2002.  (Tr. 147.)   Plaintiff went for a consultative exam on

August 27, 2002 and the doctor concluded that Plaintiff was presently somewhat disabled by a

cataract in the left eye and secondarily by poor vision in the left eye but since surgery was

scheduled for September 27, 2002, the disability was likely to be temporary.  (Tr. 153, 154.)

Based on the medical record, it is evident that Plaintiff does have visual limitations, but, this

Court finds that the ALJ's determination that those limitations are not sufficiently severe as to

constitute disability within the meaning listings 2.02, 2.03 or 2.04 is supported by substantial

evidence.  See Fargnoli, 247 F.3d at 35; see also Hartranft, 181 F.3d at 360; Taybron, 667 F.2d at

413.

Plaintiff's allegations regarding the severity or his asthma are inconsistent.  When

Plaintiff's medical history was taken on October 7, 1999 there was no indication of a history of

asthma.  (Tr. 118.)  When Dr. Patel conducted an examination on September 4, 2001, Plaintiff

alleged asthma for five years that caused "short[ness] of breath with exertion." (Tr. 120.)  On

August 15, 2002, at Plaintiff's internal medicine consultative exam, Plaintiff told Dr. Buglisi, "he

gets around his apartment okay and can do what he needs to do." (Tr. 147.)  At the same

appointment when asked about his asthma Plaintiff explained, "oh that's fine; I have no problem

with that."  (Tr. 147, 148.)  Plaintiff had chest x-rays which did not reveal acute infiltrates or

effusions and Dr. Buglisi stated Plaintiff had no cough, wheezing, shortness of breath on exertion

or pain upon breathing.  (Tr. 148, 152.)  On September 12, 2002, only a month later, Dr. Briski

indicated Plaintiff's primary diagnosis was asthma and his secondary diagnosis was blindness and

low vision.  (Tr. 29, 163.)  Additionally, the record does not indicate Plaintiff ever took

medication for the treatment of asthma.  (Tr. 22, 120, 148.)  Based on these findings the ALJ's

conclusion that Plaintiff's asthma is not of the severity as required by section 3.02A and 3.03 was

supported by substantial evidence.  See Fargnoli, 247 F.3d at 35; see also Hartranft, 181 F.3d at

360; Taybron, 667 F.2d at 413.

The medical record is absent substantial evidence to conclude that the ALJ committed

factual error in determining the Plaintiff's hernia was not of the level of severity required by the

listings.  Plaintiff was diagnosed with a right groin bulge hernia on September 12, 1999.  (Tr.

119.)  At Plaintiff's September 4, 2001 appointment, he claimed that the impairment caused pain

sometimes but surgery had not yet taken place.  (Tr. 120.)  At Plaintiff's August 15, 2002

appointment with Dr. Buglisi, Plaintiff explained although he suffered from the right hernia for

two years he had not undergone surgery because of issues with his financial situation.  (Tr. 147.)

He claimed the hernia also prevents him from doing heavy lifting and "when he drinks too much

water, the pain increases." (Tr. 147.)  After evaluation Dr. Buglisi concluded the hernia was

approximately 4 x 5 inches in diameter, needed immediate attention and, in the interim, heavy lifting should be avoided.  (Tr. 149, 150.)  There is no medical evidence that the Plaintiff's hernia resulted in damage to any organ system in the body as required by the listings, so the ALJ's conclusion was supported by substantial evidence.  See Fargnoli, 247 F.3d at 35; see also Hartranft, 181 F.3d at 360; Taybron, 667 F.2d at 413.

The medical record is consistent with the ALJ's finding that Plaintiff's hypertension is not of the level of severity as required by the listings.  At Plaintiff's September 4, 2001 appointment with Dr. Patel, Plaintiff explained that once or twice a week "he experiences tiredness and redness of the face and shortness of breath" when his blood pressure is elevated.  (Tr. 120.)  Plaintiff complained of headaches but denied "any chest pain or renal complaints from hypertension[,]" and Dr. Patel noted Plaintiff suffered from uncontrolled hypertension.  (Tr. 120, 122.)  At Plaintiff's August 15, 2002 appointment with Dr. Buglisi, he explained he "takes Coreg, 6.25 mg twice a day and Uniretic 15/25 once a day."  (Tr. 147.)  He did not complain of chest pain and stated he "can do what he needs to around his house."  (Tr. 147.)  Dr. Buglisi indicated Plaintiff should have a cardiac evaluation and echocardiogram to check for left ventricular hypertrophy.  (Tr. 149, 150.)  On February 25, 2002, Plaintiff underwent a Dobutamine Stress Echocardiogram for his hypertension.  (Tr. 170.) The test was interpreted to conclude that Plaintiff had "[n]ormal [left ventricle] chamber size and function[;]" "[m]ild to moderate concentric [left ventricle] hypertrophy[; [n]o resting wall motion abnormality[; [m]ild mitral regurgitation[; [m]ild tricuspid regurgitation; [m]ild pulmonary hypertension[;] . . . and no pericardial effusion."  (Tr. 171.)  The medical record consistently indicates Plaintiff had blood pressure which was above normal.  (Tr. 116, 118, 121, 149, 167, 170.)   The ALJ properly evaluated Plaintiff's hypertension by reference to the by systems typically effected by the impairment (heart, brain, kidneys, or eyes)

and considered Plaintiff's limitations, posed by hypertension, in so far as assessing residual

functional capacity.  The medical record does not contain evidence to contradict the ALJ's finding

that Plaintiff did not suffer from hypertensive cardiovascular disease as outlined in sections 4.02,

4.03 and 4.04 of the listings, so that determination was supported by substantial evidence."  See

Fargnoli, 247 F.3d at 35; see also Hartranft, 181 F.3d at 360; Taybron, 667 F.2d at 413.

        In conclusion, the medical record provides substantial evidence discrediting Plaintiff's

claims of subjective pain and impairment, and at no point did a doctor indicate that Plaintiff was

permanently and completely disabled.  Therefore, ALJ DeSteno's conclusion that Plaintiff's

subjective complaints lack credibility is supported by substantial evidence.  See Fargnoli, 247

F.3d at 35; see also Hartranft, 181 F.3d at 360; Taybron, 667 F.2d at 413.

> ## 2.    Did ALJ DeSteno Consider the Combined Effect of Plaintiff's Various Impairments as Required by 42 U.S.C. § 423(d)(2)(B)?

        Plaintiff asserts that ALJ DeSteno did not consider the impairments in combination; this

argument appears to be based on the ALJ's failure to specifically state that he considered the

impairments in combination.  Plaintiff fails to state, however, how a combined-impairments

analysis would demonstrate an inability to return to his past relevant work.  Plaintiff merely puts

forth the conclusory statement that the ALJ's failure to consider the impairments in combination

constitutes reversible error.  (Pl.'s Mem. L. at 10-11.)

        Throughout the five-step process, the Commissioner is obligated to consider all of the

alleged impairments individually and in combination.  42 U.S.C. § 423(d)(2)(B).  However,

Plaintiff still bears the burden in the first four steps of the analysis to demonstrate how his

impairments, whether individually or in combination, amount to a qualifying disability.  Burnett,

220 F.3d at 118; Williams, 87 F. App'x. at 243.  Moreover, even if Plaintiff can demonstrate that

the ALJ did not consider his impairments in combination, Plaintiff bears the burden of demonstrating an inability to return to his or her past relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).  In analyzing the evidence, the ALJ is not obligated to employ particular "magic words," Sassone v. Comm'r of Soc. Sec., No. 05-2089, 2006 WL 15182 at *4 (3d Cir. Jan. 20, 2006) (citing Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)), or adhere to a particular format in explaining his decision.  Jones, 364 F.3d at 505.  In memorializing his decision, the ALJ must ensure "that there is sufficient development of the record and explanation of findings to permit meaningful review."  Jones, 364 F.3d at 505.  Furthermore, the ALJ's opinion need "not have a specific section dedicated to the assessment of the [combined] impact of" Plaintiff's impairments.  Bryan v. Barnhart, No. 04-191, 2005 U.S. Dist. Lexis 1493 at *3 (E.D. Pa. Feb. 2, 2005).

In light of these standards, ALJ DeSteno's opinion demonstrates that he adequately considered Plaintiff's impairments in combination and assessed their combined severity and impact on Plaintiff's ability to perform past relevant work.  ALJ DeSteno analyzed the severity and impact of all of Plaintiff's claimed impairments: hernia, asthma, poor vision and high blood pressure.  The ALJ considered and discussed Plaintiff's visual impairments under sections 2.02, 2.03 and 2.04 of the Listings; his history of asthma under sections 2.02, 2.03 and 2.04 of the Listings; and hypertension under sections 4.02, 4.03 and 4.04 of the Listings.  (Tr. 22.)  In considering Plaintiff's right-sided hernia ALJ DeSteno found that there was no evidence that it resulted in damage to any organ system that is outlined in the Listings.  (Tr. 21-22.)  The fact that ALJ DeSteno did not specifically note that he was considering Plaintiff's impairments in combination does not render the decision unsupported by substantial evidence.  See Bryan, 2005 U.S. Dist. Lexis 1493 at *4 (stating that "[b]y analyzing and discussing the severity of each of

31

Plaintiff's impairments, [the] ALJ . . . evidenced that she was reviewing the impact of the combination of Plaintiff's impairments").  ALJ DeSteno's step-by-step analysis of each impairment demonstrates that he considered each impairment in light of existing impairments. For example, with respect to Plaintiff's limited ability to lift because of his right-sided hernia, ALJ DeSteno considered not only the various medical diagnoses but engaged in an analysis of how the hernia would affect Plaintiff in the working environment.  (Tr. 22.)

Additionally, even if Plaintiff were to prove that ALJ DeSteno did not consider the impairments in combination, Plaintiff fails to show how a "combination analysis" would have demonstrated an inability to return to past relevant work.  Plaintiff merely makes the naked claim that the ALJ did not consider the impairments in combination, resulting in reversible error. Plaintiff explains that he has several impairments that nearly miss as qualifying impairments, so several near-misses surely equals one qualifying impairment.  See Pl.'s Mem. L. at 15 (stating, "[a]ssuming arguendo that plaintiff narrowly misses a listed impairment, his individual impairments when taken in combination surely equal the Listings"). This logic is insufficient to undercut ALJ DeSteno's analysis of the impaired in combination, which is apparent from the record.  In conclusion, the record demonstrates that ALJ DeSteno adequately considered the combined impact of Plaintiff's impairments in reaching his decision, and the ALJ's finding that Plaintiff's combined impairments do not result in a qualifying impairment is supported by substantial evidence. See Fargnoli, 247 F.3d at 35; see also Hartranft, 181 F.3d at 360; Taybron, 667 F.2d at 413.

3. **Did the ALJ Err as a Matter of Law in Finding that Plaintiff could Perform Light Work?**

Plaintiff contends that ALJ DeSteno's determination should be reversed because "[t]he

residual functional capacity [assessment] is merely conclusory and not supported by medical evidence." (Pl.'s Mem. L. at 16.)  In support of this assertion, Plaintiff notes that the ALJ found Plaintiff able to perform as a labeler, garment turner, packer, scale operator and office cleaner, settings that Plaintiff contends would put him in an environment that is rife with pulmonary irritants.  (Tr. 27.)  Plaintiff further contends that the job of office cleaner in particular would require Plaintiff to "personally use chemicals which would aggravate his condition."  (Pl's Mem. L. at 16.)  These assertions, however, are "no more than a disagreement with the ALJ's decision, which is soundly supported by substantial evidence."  Perkins v. Barnhart, 79 F. App'x.  512, 515 (3d Cir. 2003).  In reaching his conclusions, ALJ DeSteno relied on the many consistent evaluations of treating physicians and state agency medical consultants, who are considered experts in the evaluation of medical disability claims.  See 20 C.F.R. §§ 404.1527(f) and 416.927(f).

Specifically, Judge DeSteno utilized the evaluations to determine that Plaintiff's physical limitations enabled him to perform a limited range of light work and used testimony from a vocational expert to establish that there were still a "significant number of jobs in the national economy that [Plaintiff] could perform."  (Tr. 27.)  The record demonstrates that Plaintiff underwent residual functional capacity assessments on January 25, 2002 and September 12, 2002. (Tr. 134, 162.)  Both assessments consistently found Plaintiff's ability to work in extreme cold, extreme heat, wetness, humidity, noise, vibrations, fumes, odors, dusts, gases, poor ventilation, etc. is unlimited.  (Tr. 131, 159.)  They also both concluded that Plaintiff should avoid concentrated exposure to hazards including machinery and heights.  (Tr. 131, 159.)  Further, as part of the September 12 assessment, the doctor noted an increased risk to hazards due to the left eye vision loss.  (Tr. 159.)  Plaintiff claims that the types of jobs offered by the ALJ involve

pulmonary irritants, but there is no evidence in the record to conclude that the source of Plaintiff's limitations was his alleged asthma.  In fact, both of the assessments determined that Plaintiff was not limited in his ability to work in an environment with fumes, odors, dusts, gasses or poor ventilation.  (Tr. 159, 128.)  Furthermore, Plaintiff's allegations of asthma are inconsistent.  He never took medication for the impairment, and he did not consistently describe the extent and duration of this impairment to doctors.   (Tr. 22, 118, 120, 147, 148, 152.)

Finally, the vocational expert's testimony was based on the following, which is consistent with the January 15 and September 12, 2002 residual functional capacity assessments:   "the residual functional capacity initially for lifting and carrying objects weighing up to 20 pounds, and frequently lifting and carrying objects weighing up to 10 pounds.  Sitting, standing and walking up to six hours in an eight hour day.  Pushing and pulling on the leg controls, and work not involving exposure to height or dangerous machinery.  Not requiring binocular vision or detailed visual work in an environment free of excessive pulmonary irritants."  (Tr. 224, 225.)  Based on these limitations, the vocational expert suggested jobs as a labeler, garment turner, scale operator, or office cleaner.  (Tr. 225.)  The vocational expert further testified that if additional complaints of fatigue, easily breathlessness, limited walking ability and limited vision were added to the above limitations, Plaintiff would not be able to perform the jobs previously suggested or any other jobs in the national economy.  (Tr. 226.)  There is, however, little documented evidence to support the existence of such additional symptoms.

Given that Plaintiff has the burden of proving disability in the first four steps of the analysis, "the . . .  Commissioner, is 'entitled to rely not only on what the record says, but also on what it does not say.'"  Bryan, 2005 U.S. Dist. Lexis 1493 at 5 (quoting Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)).  Notwithstanding Plaintiff's claims to the contrary, the medical

evidence does not corroborate his subjective claims of impairment on his ability to work.  Rather, substantial evidence supports ALJ DeSteno's finding that Plaintiff retained an ability to perform a limited range of light work, so Plaintiff's claim that the ALJ erred as a matter of law is unfounded.  See Fargnoli, 247 F.3d at 35; see also Hartranft, 181 F.3d at 360; Taybron, 667 F.2d at 413.


**CONCLUSION**

For the reasons stated above, this Court finds that the Commissioner's decision is supported by substantial evidence and is affirmed.


Dated: March 25, 2008


                                   ____s/ Stanley R. Chesler____
                                   STANLEY R. CHESLER
                                   United States District Judge